**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**SHIRLEY FADDEN**, *et al.*,

        **Plaintiffs,**     **Civil Case No. 3:13-cv-00731 (REP)**

**v.**

**PNC MORTGAGE, a division of**
**PNC BANK, N.A.**, *et al.*,

       **Defendants.**

**<u>FIRST AMENDED COMPLAINT</u>**

The Plaintiffs, SHIRLEY AND MICHAEL FADDEN, (hereinafter, "Plaintiffs"), by counsel, hereby filed this Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B) and allege as follows:

**PRELIMINARY STATEMENT**

1.  This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to 15 U.S.C. § 1681 *et seq*. (Federal Fair Credit Reporting Act or "FCRA") and for common law claims against PNC Mortgage for breach of the implied covenant of good faith and fair dealing and intentional infliction of emotional distress.

2.  At its simplest, the Fair Credit claims in this case allege that PNC, a recidivist offender of the FCRA, inaccurately reported Plaintiffs 120 days past due and over $50,000.00 delinquent on their mortgage from April 2012 through November 2012. There is no objective basis for PNC to have reported this to the credit bureaus because PNC wrongfully foreclosed on Plaintiffs' home on or around April 3, 2012.

3.     At the same time PNC was reporting the Plaintiffs as 120 days past due and over $50,000.00 delinquent, it was also fighting a lawsuit filed by the Plaintiffs in the Fairfax County Circuit Court challenging the unlawful foreclosure. In this proceeding, PNC repeatedly asserted that it "conducted the pre-foreclosure and foreclosure proceedings in accordance with Virginia law."

4.     When Plaintiffs obtained their credit reports and learned of this paradox, they began the dispute process through the national credit bureaus, and even submitted the pleadings filed by PNC as evidence that its reporting was inaccurate and incomplete. PNC then refused to investigate or correct its defamatory reporting. In doing so, it violated the FCRA.

5.     Plaintiffs also bring this lawsuit based on state law claims for breach of the covenant of good faith and fair dealing and intentional infliction of emotional distress. In this case, the Plaintiffs were parties to a note and deed of trust -- both contracts under Virginia law – with an implied duty of good faith that prohibits a party from acting arbitrarily, unreasonably, and in bad faith. PNC's actions over the past three years are the epitome of the conduct sought to be prevented by the implied covenant of good faith and fair dealing. Such conduct includes: inviting and encouraging Plaintiffs to apply for a loan modification and trial period plan without disclosing to the Plaintiffs that PNC would consider the reduced monthly payments as a delinquency that would trigger a foreclosure, failing to evaluate the Plaintiffs' eligibility within the timeframes established by the HAMP guidelines and its own promises to the Plaintiffs, wrongfully foreclosing on the Plaintiffs' property after numerous representations that a foreclosure sale would not occur, falsely representing to the Plaintiffs (after it conducted the

2

unlawful foreclosure) that the loan modification was actually denied by Plaintiffs' investor, falsely representing that PNC needed more documents in order to evaluate the Plaintiffs for a modification, falsely representing that the Plaintiffs' property would not (again) be referred to foreclosure during the loan modification process, and scheduling a foreclosure (contrary to its representations) while the Plaintiffs were still being evaluated for a modification.

6.      To be clear, Plaintiffs' breach of implied duty of good faith and fair dealing claim does not allege that PNC (either under its Servicer Participation Agreement or any Trial Period Plan) was contractually required to offer the Plaintiffs a loan modification. By contrast, Plaintiffs contend that PNC acted arbitrarily, unreasonably, and with bad faith during Plaintiffs' two-year effort to obtain a loan modification. The Plaintiffs' claims are very similar to several recent cases in this District against other mortgage servicers. *See Acuna v. Chase Home Finance, LLC*, 2011 U.S. Dist. LEXIS 52971 (E.D. Va. May 17, 2011) (Spencer, J.); *SunTrust Mortg., Inc. v. Mortgs. Unlimited, Inc.,* 2012 U.S. Dist. LEXIS 74106 (E.D. Va. May 29, 2012) (Hudson, J.); *see also Bourdelais v. JPMorgan Chase Bank*, 2012 U.S. Dist. LEXIS 158508, *15 (denying defendant's motion to dismiss plaintiff's claim for breach of the implied covenant of good faith and fair dealing because the plaintiff alleged sufficient facts, if true, to show: (1) a contractual relationship; and (2) unreasonable conduct and bad faith); *Gudym v. Bank of America*, *N.A.*, Civil Action No. 3:12-cv-00275 (Docket No. 27) (Trenga, J.) (denying Bank of America's Rule 12(b)(6) motion without oral argument because the plaintiff alleged facts sufficient to make her claims sufficiently plausible).

7.     Plaintiffs further allege claims against Experian, Equifax, and Trans Union under the FCRA, 15 U.S.C. §§1681e(b) and 1681i for their failure to reasonably ensure the maximum possible accuracy of their credit reports and to investigate and correct the Plaintiff's credit files when he disputed the inaccuracies.

## JURISDICTION

8.     The jurisdiction of this Court is conferred by the FCRA, 15 U.S.C. § 1681(p) and 28 U.S.C. §1331.

9.     This court also has jurisdiction over Plaintiffs' state law claims by supplemental jurisdiction under 28 U.S.C. § 1367.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

11.     The Plaintiff, SHIRLEY FADDEN ("Mrs. Fadden" or "Plaintiff"), is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

12.     The Plaintiff, MICHAEL FADDEN ("Mr. Fadden" or "Plaintiff"), is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

13.     Upon information and belief, PNC MORTGAGE, LLC is a wholly owned subsidiary of PNC Bank, N.A. doing business as a mortgage originator and servicer in the Commonwealth of Virginia as the servicing agent for PNC Bank, N.A. Upon information and belief, PNC Mortgage is a "furnisher" as governed by the FCRA.

14.     Defendant Equifax Information Services, LLC ("Equifax") is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

15.     Upon information and belief, Equifax is a "consumer reporting agency" as defined in 15 U.S.C. §1681(f).  Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

16.     Upon information and belief, Equifax disburses such consumer reports to third parties under contract for monetary compensation.

17.     Defendant Experian Information Solutions, Inc. ("Experian") is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

18.     Upon information and belief, Experian is a "consumer reporting agency" as defined in 15 U.S.C. §1681(f).  Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

19.     Upon information and belief, Experian disburses such consumer reports to third parties under contract for monetary compensation.

20.     Defendant Trans Union, LLC ("Trans Union") is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

21.     Upon information and belief, Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. §1681(f).  Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

22.     Upon information and belief, Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

## FACTS

23.     On or around July 14, 2003, Plaintiffs purchased their property located at 5209 Honeysuckle Court, Centreville, Virginia 20120 (the "Property").

24.     The Note is secured by a Deed of Trust (the "Deed of Trust") on the Property dated July 14, 2003, and recorded in the Clerk's Office of the Circuit Court of the County of Fairfax, Virginia.

25.     Like many homeowners, Plaintiffs had experienced financial struggles during the past several years primarily because Mr. Fadden is a small business owner who specializes in the sale of home security systems.

26.     Given their struggles, Plaintiffs pursued loss mitigation alternatives through their loan servicer, Defendant PNC Mortgage.

### A.  The Foreclosure Crisis

27.   Over the last several years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in

foreclosure or default.[1] Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation.  The latest total represents a 22 percent increase from the first quarter of the year and nearly 15 percent above the level reporting for the second quarter of 2009.[2]

28.    Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

**B.  Creation of Home Affordable Modification Program**

29.    Motivated in significant part by such concerns, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A. §5201 et. seq. (2009).

30.    The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. § 5201.

31.    The Act established the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  In exercising its authority to administer TARP, the Act mandated that the Secretary of Treasury take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).   It further mandated that the Secretary "shall implement a

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.
[2]  www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures" and to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. § 5219.

32.    On February 18, 2009, the Treasury Secretary and the Director of the Federal Housing Finance Agency created a uniform loan modification protocol, previously identified as HAMP, the program that is at issue in this case.

33.    HAMP is funded by the federal government, primarily with TARP funds. In the last two years, the Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

34.    The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. PNC is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

35.    Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

**C.  PNC Wrongfully Forecloses on Plaintiffs' Home in April 2012**

36.    Defendant PNC's efforts to foreclose Plaintiffs' home began in May 2011.

8

37. In a letter dated May 19, 2011 ("Pre-Acceleration Notice"), Defendant notified Plaintiffs that they were in default on their mortgage obligations.

38. Prior to receiving the Pre-Acceleration Notice, Plaintiffs contacted Defendant PNC Mortgage to request hardship assistance due to the reduction of their income attributed to the struggles of Mr. Fadden's business.

39. In response, Defendant PNC Mortgage sent Plaintiffs a letter dated July 23, 2011, which outlined Plaintiffs loss mitigation options. This letter instructed Plaintiffs to call Defendant PNC Mortgage to provide basic financial information so it could determine if they met the requirements for foreclosure alternatives.

40. After receiving this letter, Plaintiffs immediately contacted Defendant PNC Mortgage at the number provided. During this telephone conversation, Plaintiffs provided the basic financial information requested by Defendant PNC Mortgage's employee.

41. After this conversation, Plaintiffs received a letter dated August 12, 2011, which outlined additional information needed from the Plaintiffs.

42. Plaintiffs provided this information within the time period requested by the letter dated August 12, 2011.

43. On September 22, 2011, Defendant PNC Mortgage sent Plaintiffs follow-up correspondence indicating that it had received it Plaintiffs' initial package of documents.

44. Plaintiffs continued to provide documents when requested throughout the next several months. Nevertheless, Defendant PNC Mortgage erroneously closed their file twice while they were under review.

9

45.     This pattern continued into March 2012 when Jennifer King ("Ms. King"), an employee of Defendant PNC Mortgage was assigned as Plaintiffs' new Loss Mitigation representative.

46.     Ms. King had been the fourth Loss Mitigation representative assigned to Plaintiffs' file in less than one year.

47.     In multiple correspondences from PNC Mortgage, Mr. and Mrs. Fadden were assured that no foreclosure sale would occur so long as they were under review for a loan modification.

48.     On April 3, 2012, Ms. King left a voicemail at Plaintiffs' home requesting Plaintiffs to call her back.

49.     Mr. Fadden called Ms. King back immediately after receiving the message on April 3, 2012.

50.     During this conversation, Ms. King informed Mr. Fadden that Plaintiffs had been approved for a loan modification.

51.     Ms. King then setup a conference call with another PNC Mortgage employee, Tim, who was the negotiator for Plaintiffs' loan modification.

52.     Tim informed Mr. Fadden that his new payment amount would be $2,850.00, which was approximately $250.00 more than Plaintiffs' previous monthly mortgage payments.

53.     After discussing the obvious problems with the modification amount, Tim informed Mr. Fadden that "he would put a ten to thirty day extension on the file so no foreclosure sale would occur."

10

54.    Tim said that this extension would allow him to evaluate "whether there was anything he could do" to reduce the modification amount.

55.    In addition, Ms. Fadden was out of town at that time, so Mr. Fadden wanted to consult her prior to agreeing to the modified payment amount.

56.    During this conversation, Tim indicated that would be no problem and the extension would allow him to discuss this with his wife and no foreclosure sale would occur.

57.    One week after his conversation with Ms. King and Tim, Mr. Fadden was approached at his home by Mr. Atul Bhatia ("Mr. Bhatia").

58.    Mr. Bhatia informed Tim that his home had been foreclosed on April 4, 2012, and was purchased by AV Capital, LLC.

59.    This disappointed and surprised Mr. Fadden because of the assurances from Tim and Ms. King that the foreclosure would be postponed while Tim evaluated whether his payments could be reduced.

60.    After hearing the devastating news, Mr. Fadden called Ms. King and Tim to discuss how to correct the mistake. During this conversation, Tim said that he was "sorry" and that sometimes "it just doesn't work out."

61.    Mr. Fadden responded to these statements by informing Tim and Ms. King "that his trust in them led to the foreclosure," and requested their assistance in rescinding the foreclosure. Tim then told Mr. Fadden that he may want to hire an attorney.

62.    Prior to the foreclosure, Plaintiffs were never denied for their HAMP modification. After the foreclosure, PNC mailed correspondence to the Plaintiffs dated April 9, 2012, which

11

falsely represented that the modification was denied because the modification "was not approved by all required investors."

63.    Upon information and belief, PNC's basis for its denial was entirely inaccurate and selected solely as a means to cover up its mistake in conducting the unlawful foreclosure.

### D.  Plaintiffs Filed a Lawsuit in Fairfax County Circuit Court

64.    On May 24, 2012, the Plaintiffs filed an action against PNC in the Circuit Court for the County of Fairfax.

65.    Around this same time, the Plaintiffs also filed a complaint with the Consumer Financial Protection Bureau.

66.    On August 30, 2012, PNC filed a Demurrer asserting, among other things, that the "Plaintiffs' allegations bar them from the relief that they seek in this case because the substitute trustee was properly appointed, had the legal authority to foreclose, and conducted the pre-foreclosure and foreclosure proceedings in accordance with Virginia law."

67.    PNC made a virtually identical statement in support of a Plea in Bar filed contemporaneously with the Demurrer.

68.     On October 5, 2012, PNC filed a Memorandum in Support of its Demurrer where it continued to contend that it lawfully conducted the foreclosure sale on the Plaintiffs' home.

69.    PNC's position in the lawsuit was also consistent with its response to the Consumer Financial Protection Bureau dated June 19, 2012, where PNC, through counsel, indicated that "PNC Mortgage has reviewed [the Fadden's] file thoroughly and determined that the foreclosure sale was valid and it will not be rescinded."

70.     PNC noticed the Demurrer for a hearing on November 30, 2012, but continued the hearing to January 4, 2013.

71.     Ultimately, Plaintiffs non-suited the lawsuit in January 2013 after PNC rescinded the wrongful foreclosure sale.

72.     Plaintiffs non-suited the lawsuit after written and verbal assurances that PNC would consider Plaintiffs for a loan modification.

73.     For example, in a letter dated December 8, 2012, and consistent with its representations prior to the non-suit, PNC stated:

> As your mortgage servicer, we want you to know there is a program available that may help you. If you qualify under the federal government's Home Affordable Modification program and comply with the terms of the Home Affordable Modification Trial Period, we will modify your mortgage loan and you can avoid foreclosure.
> …
>
> We will not proceed with pending foreclosure sale until after the 12/23/2012 and completion of our review of your submission.

74.     Plaintiff submitted the documents in accordance with the instructions in the December 8, 2012 letter from PNC.

75.     Similarly, in a letter dated January 7, 2013, and consistent with its previous representations, PNC wrote:

> You recently submitted information for application into the Making Home Affordable Program. In order to continue the review of your account for hardship assistance, there are specific documents required.
>
> …

During the MHAP evaluation, the property will not be referred to foreclosure; or be sold at a foreclosure sale, if the foreclosure process has already been initiated.

76.     After receiving this letter, Plaintiffs submitted the requested documents as instructed by PNC, who then refused to even speak with the Plaintiffs because PNC's internal records incorrectly indicated that the account was still subject to litigation.

77.     After agreeing to speak with the Plaintiffs, PNC indicated that it had all the documents that it needed and that it would make a determination on Plaintiffs eligibility within several weeks.

78.     Based on their previous experience, Plaintiffs diligently followed-up with PNC in February and March 2013 to inquire about the status of their loan modification.

79.     During each communication, PNC representatives assured the Plaintiffs that their applications was under review and that PNC would provide the Plaintiffs with a determination very soon.

80.     Nevertheless, PNC has failed to make any determination whatsoever regarding the status of Plaintiffs' modification. Instead, PNC continues to falsely represent that Plaintiffs need to submit additional, duplicative and unnecessary documents in order to be considered for a modification. Such requests occurred on or around January 7, 2013, February 8, 2013, February 27, 2013, March 12, 2013, March 26, 2013, April 22, 2013, May 16, 2013, June 25, 2013, September 17, 2013, and October 28, 2013.

81.     Each time, Plaintiffs diligently submitted document after document requested by PNC, yet it continued to string them along and falsely represent a decision was coming soon and that the property would not be referred to foreclosure during the evaluation.

14

82.     In fact, as late as October 28, 2013, Plaintiff mailed correspondence to the Plaintiffs that expressly stated "During the MHAP evaluation, the property will not be referred to foreclosure, or be sold at a foreclosure sale, if the foreclosure process has been initiated."

83.     These repeated representations were utterly false as reflected by the correspondence from Samuel I. White, P.C. date October 15, 2013, which enclosed a notice of foreclosure sale of the Plaintiffs' property scheduled for November 7, 2013.

### E.  Factual Allegations Regarding Plaintiffs' FCRA Claims

84.     In November 2012, Plaintiffs obtained a copy of their credit reports from Trans Union, Experian, and Equifax. All three credit bureaus were reporting inaccurate and incomplete information regarding Plaintiffs' mortgage account reported by PNC. In essence, Plaintiffs' credit reports were reporting as if a foreclosure never occurred and the property was not purchased by AV Capital.

85.     To that end, the credit reports inaccurately and incompletely stated that Plaintiffs were 120 days delinquent on their mortgage loan from April 2012 through November 2012. Moreover, PNC was reporting that Plaintiffs were $54,431 past due on their mortgage loan.

86.     The credit reporting was inaccurate and incomplete as PNC had wrongfully foreclosed on the Plaintiffs' home and refused to accept any payments from April 2012 through November 2012. Moreover, it was inaccurate to report that Plaintiffs had a past due balance (or any balance whatsoever) because the home was currently foreclosed, had been purchased by a third party, and Plaintiffs were no longer required to make their $2,592 monthly mortgage payments after April 2012.

15

87.     The credit reporting was especially shocking to the Plaintiffs because PNC was asserting the validity of the sale in the action in Fairfax Circuit Court, yet reporting the Plaintiffs delinquent for every single month as if the sale had never occurred.

88.     In November 2012, Plaintiffs sent credit dispute letters to Equifax, Experian and Trans Union explaining that the information reported by PNC was inaccurate. In their letters, Plaintiffs explained that the account should not have a past due balance of $54,431 because PNC wrongfully foreclosed on the Plaintiffs' home and PNC would not let Plaintiff make any payments since that date. Plaintiffs further explained that it should not reflect that Plaintiffs did not pay their $2,592 monthly mortgage payment from April 2012 through November 2012 because PNC foreclosed on the home, continued to assert that the sale was valid, refused to accept payments on the loan, and never sent a single mortgage statement during this time requesting a payment.

89.     On or about December 6, 2012, Equifax provided its Investigation Results to the Plaintiffs, which indicated that PNC "verified" the current status of the mortgage was reported correctly. The Investigation Results further reflected that Plaintiffs were 120-149 days past due on their mortgage loan from April 2012 through November 2012. Worst yet, PNC was now reporting a past due balance in the amount of $58,288.

90.     On or about December 8, 2012, Trans Union provided its Investigation Results to the Plaintiffs, which indicated that PNC "verified" the current status of the mortgage was reported correctly. The Investigation Results further reflected that Plaintiffs were 120 days past due on their mortgage loan from June 2012 through October 2012. Trans Union's Investigation

Results did not provide any account information for the months of April, May, and November 2012. Interestingly, Trans Union's Investigation Results for Mr. Fadden indicated that the past due amount of the loan was $57,023; however, its Investigation Results for Mrs. Fadden indicated that the amount past due was $58,233.

91.     Plaintiffs sent a follow-up dispute letter to Experian, Equifax and Trans Union in December 2012, once again disputing the PNC's reporting. In these letters, Plaintiffs once again explained that their home was wrongfully foreclosed and that it was inaccurate to report them as 120-180 days delinquent during the months when the home was foreclosed. Along with the letters, Plaintiffs enclosed a copy of the Demurrer and Plea in Bar filed by PNC to confirm PNC's belief that a valid foreclosure sale occurred in April 2012.

92.     On or about January 2, 2013, Equifax provided its Investigation Results to Plaintiffs' follow-up dispute letters. In its Investigation Results, Equifax indicated that the status of Plaintiffs' account was updated, yet the only information changed by PNC was an increase in the past due balance. The Investigation Results still reflected that Plaintiffs were 180 days past due from April 2012 through November 2012.

93.     Similarly, on or about January 1, 2013, Trans Union provided its Investigation Results to Plaintiffs' follow-up dispute letters. In its Investigation Results, Trans Union indicated that the status of Plaintiffs' account was updated. The new status reflected that the payment history for April 2012 through November 2012 was 120 days past due. Moreover, the Investigation Results still improperly reflected a past due balance of $58,297.

94.     Upon information and belief, on or about January 8, 2013, Experian provided its Investigation Results to Plaintiffs' follow-up dispute letters. In its Investigation Results, Experian indicated that the status of Plaintiffs' account was updated, but Experian failed to correct its inaccurate reporting.

95.     These reportings were false and incomplete. Plaintiffs' home was wrongfully foreclosed, PNC no longer

96.     Experian, Equifax, and Trans Union had knowledge that mortgage loan modifications and foreclosures often result in inaccurate credit reporting because of the lack of systems, procedures, and protocols to ensure accurate credit reporting during the loan modification or after a foreclosure.

97.     PNC had knowledge that mortgage loan modifications and foreclosures often resulted in inaccurate credit reporting because of the lack of systems, procedures, and protocols to ensure accurate credit reporting during the loan modification.

98.     Moreover, PNC was aware of the specific problems with Plaintiffs' mortgage as early as May 2012 when Plaintiffs filed their lawsuit in the Fairfax County Circuit Court and an investigation with the Consumer Financial Protection Bureau.

99.     Defendants each received, but ignored the Plaintiff's disputes and refused to delete the inaccurate information regarding the account from the Plaintiff's credit file.

100.    Defendants each had actual knowledge of these inaccuracies and deliberately chose to ignore and permit the reporting of the information.

101.    On numerous occasions, Defendants Equifax, Experian and Trans Union furnished the Plaintiffs' consumer reports to multiple entities which contained the inaccurate derogatory information regarding the PNC account.

### PNC's Willful Misconduct

102.    PNC has substantial notice and knowledge regarding its FCRA problems and that its FCRA procedures were unreasonable and violate the FCRA.

103.    For example, PNC has been sued repeatedly for violations of the FCRA. *See, e.g.*, *Daly v. PNC BANK, N.A.*, Case No. 2:11-cv-00208 (W.D. Pa. 2011); *Whitney v. Experian Information Solutions, Inc.*, Case No. 3:13-cv-03177 (S.D. Cal. 2013); *Parris v. PNC Mortgage*, Case No. 3:13-cv-00860 (E.D. Va. 2013); *Josett v. PNC Financial Services Group*, Case No. 2:11-cv-00781 (S.D. Ohio 2011); *Hendricks v. PNC Mortgage*, 3:13-cv-04915 (N.D. Tex. 2013); *Clement v. PNC Mortgage*, 1:12-cv-03759, (N.D. Ga. 2012); *Davies v. Equifax, Inc.*, 2:10-cv-01339 (E.D. Cal. 2010); *Haberman v. PNC Mortgage Co.*, 4:11-cv-00126 (E.D. Tex. 2011); *Coffey v. PNC Bank*, 3:13-cv-06050 (D. N.J. 2013); *Appel v. PNC Bank*, Case No. 8:11-cv-02021 (M.D. Fla. 2011); *Montgomery v. PNC Bank*, Case No. 2:12-cv-02453 (N.D. Cal. 2012); *Williams v. Trans Union, LLC*, Case No. 2:02-cv-02574 (E.D. Pa. 2002); *Margeson v. Experian Information Solutions, Inc.*, Case No. 2:03-cv-04483 (E.D. Pa. 2003).

104.    Despite these lawsuits, PNC knowingly and/or recklessly choose to ignore its obligation to conduct detailed and searching investigation when it received the Plaintiffs' FCRA disputes through a CRA.

105.    Moreover, PNC repeatedly engaged in the objectionable conduct by reporting the inaccuracies after it had at least six different occasions to conduct an investigation into the Plaintiffs' dispute letters with Experian, Equifax, and Trans Union.

106.    At the time PNC verified the information, PNC was aware – through its previous lawsuits and general counsel's office – that the FCRA requires furnishers (such as PNC) to conduct a "detailed inquiry or systematic examination." *Johnson v. MBNA*, 357 F.3d 426, 430 (4th Cir. 2004). (citing Am. Heritage Dictionary 920 (4th Ed. 2000)).

107.    No detailed inquiry or systematic examination into Plaintiffs' disputes would have resulted in PNC maintaining that the Plaintiffs had missed their $2,592 monthly mortgage payment from April 2012 through January 2013; and that Plaintiffs were 120 days past due on the $2,592 mortgage payment for those months. Moreover, a detailed inquiry as required by this Circuit would have reflected that: (1) that PNC was no longer sending monthly statements to the Plaintiffs for these payments; (2) that a third-party purchased the Plaintiffs' home on April 4, 2012;  (3) that PNC hired legal counsel to defend against the validity of the foreclosure after the Plaintiffs commenced a lawsuit in the Fairfax County Circuit Court; (4) that PNC had continued to maintain the validity of the sale to the Consumer Financial Protection Bureau; and (5) that PNC representatives had apologized to the Plaintiffs regarding the unlawful foreclosure and instructed Plaintiffs to hire an attorney.

108.    Instead, and consistent with its conduct in previous lawsuits, PNC willfully violated the FCRA even though it knew that it requires furnishers to conduct a detailed inquiry when it receives a consumers' dispute through the CRAS.

20

109.    As a result of PNC's violations, Plaintiff suffered actual damages, including but not limited to: loss of time working to correct the reporting of the inaccurate account, loss of credit, damage to reputation, embarrassment, humiliation, sleepless nights, and other mental and emotional distress.

### COUNT ONE: BREACH OF CONTRACT FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (*PNC*)

110.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

111.    A covenant of good faith and fair dealing exists in every valid Virginia contract, including notes and deeds of trust pertaining to real property such as the note and deed of trust pertaining to Plaintiff's property. A breach of covenant of good faith and fair dealing is a breach of the underlying contract.

112.    PNC failed to perform its duty of good faith and fair dealing with respect to Plaintiffs by foreclosing on the home in April 2012 after PNC assured Plaintiffs that the foreclosure would not occur and Plaintiffs would be offered a modification; inducing them into applying for a HAMP loan modification after the wrongful foreclosure sale and misrepresenting that it would evaluate Plaintiffs' application for eligibility; failing to abide by the terms of the Note and Deed of Trust that govern the original loan; failing to follow HAMP guidelines; failing to properly safeguard and maintain important documents provided by Plaintiffs; falsely representing to the Plaintiffs' loan modification was denied by Plaintiffs' investor in April 2012, falsely representing that PNC needed more documents in order to evaluate the Plaintiffs for a

modification, falsely representing that the Plaintiffs' property would not (again) be referred to foreclosure during the loan modification process, and scheduling a foreclosure in November 2013 (contrary to its representations) while the Plaintiffs were still being evaluated for a modification.

113.    PNC's breach of its duty to act in good faith and deal fairly with Plaintiffs breached the Note and Deed of Trust.

114.    Because of its breach of the implied covenant of good faith and fair dealing, PNC is not entitled to exercise its remedy of foreclosure under the Deed of Trust.

115.    Plaintiffs also suffered actual damages including but not limited to: the accrual of default servicing fees and foreclosure fees, the embarrassment of multiple foreclosure advertisements and a foreclosure sale, unnecessary anxiety, emotional distress and mental anguish, credit damage, and are threatened with additional harm from Defendant's breach.

116.    To the extent actual damages will not fully and fairly compensate Plaintiffs, they are also entitled to specific performance and other appropriate injunctive relief.

## COUNT TWO: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (*PNC*)

117.    Plaintiffs reallege and incorporate the factual allegations as if fully set out herein.

118.    Defendants' conduct was intentional and reckless as evidenced by its constant disregard of the rights of the Plaintiffs for more than two years.

119.    Defendants' conduct is outrageous and intolerable because – over a two year span -- Defendants wrongfully foreclosed on Plaintiffs' home, represented that it would once again consider Plaintiffs for a modification, failed to properly safeguard Plaintiffs' documents and

falsely represented that it needed more documentation, represented (post-unlawful foreclosure) that it would consider Plaintiffs for a modification, and scheduling a foreclosure in November 2013 (contrary to its representations) while the Plaintiffs were still being evaluated for a modification while Mr. Fadden was still recovering from his surgery in the hospital.

120.    PNC's conduct is even more outrageous and intolerable considering the fact that PNC is aware that Mr. Fadden was diagnosed with a potential life threatening illness, which required him to have bone marrow transplant. And yet, PNC cannot even give the Plaintiffs and their teenage children peace of mind while Mr. Fadden is recovering in the hospital. Instead, without any notice whatsoever and contrary to its written and verbal representations, PNC scheduled a foreclosure sale.

121.    PNC's conduct causes severe emotional distress on the Plaintiffs, who fear that PNC will once again conduct a foreclosure sale and continue to submit documents to PNC in hopes that it will consider them for a loan modification. PNC's conduct has left Plaintiffs hopeless and debilitated because PNC continues to consider the Plaintiffs in default and assess late fees and charges while the Plaintiffs wait for a determination on their modification.

122.    Plaintiffs' emotional distress has manifested into physical injury, including but not limited to: increased stress on Mr. Fadden which required treatment from medical professionals including blood pressure medication for the first time in his life, sleepless nights and headaches for both Plaintiffs, and weight loss.

123.    Plaintiffs are also live in constant fear and anxiety because their children are in high school and live at the home.

124.    Defendants actions against the Plaintiffs are intentional, willful, and wanton considering the fact that Defendants have not even made a decision on the modification

125.    Defendants' actions were performed with malice towards the Plaintiffs and consumers in general.

126.    The actions of the Defendants are in violation of their public duty to consumers as well as their private obligation to the Plaintiffs.

127.    As a result, Plaintiffs are entitled to their actual damages based on the emotional distress caused by PNC, in addition to punitive damages for PNC's intentional, willful, and wanton conduct.

**COUNT THREE: VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)(A)**
**(*PNC*)**

128.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

129.    On one or more occasions within the past two years, by example only and without limitation, PNC violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiffs' disputes.

130.    When the Plaintiffs mailed their disputes to the consumer reporting agencies ("CRAs"), they use a dispute system named, "e-Oscar", which has been adopted by the credit reporting agencies and by their furnisher-customers such as PNC.  It is an automated system and the procedures used by the CRAs are systemic and uniform.

131.    When Equifax, Experian or Trans Union receives a consumer dispute, they (usually via an outsource vendor) translates that dispute into an "ACDV" form.

132.    Upon information and belief, the ACDV form is the method by which PNC have elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

133.    On information and belief, the Plaintiffs allege that to date PNC has never complained to the CRAs about the amount of information they receive regarding a consumer dispute through the e-Oscar system or through ACDVs.

134.    If PNC receive a consumer dispute ACDV form, it is aware that it may also contact the CRA that sent it to obtain more information regarding a consumer's dispute.

135.    Based on the manner in which Equifax, Experian and Trans Union responded to the Plaintiffs' disputes, representing that PNC had "verified" the supposed accuracy of its reporting, Plaintiffs alleges that Equifax, Experian and Trans Union did in fact forward the Plaintiffs' dispute via an ACDV to PNC.

136.    PNC understood the nature of the Plaintiffs' dispute when they received the ACDV from the credit bureaus.

137.    When PNC received the ACDV from the credit reporting agencies, it as well could have reviewed its own system and previous communications with the Plaintiffs and discovered additional substance of the Plaintiffs' dispute.

138.    Notwithstanding the above, PNC follows a standard and systemically unlawful process when it receives the ACDV dispute.  Basically, all PNC does is review its own internal

computer screen for the account and repeat back to the ACDV system the same information that PNC already had reported to the CRAs.

139.    When PNC receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in their computer system is itself accurate.

140.    As a result of PNC's violations of 15 U.S.C. §1681s-2(b)(1)(A), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

141.    The violations by PNC were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

142.    The law in this District, the Fourth Circuit and even nationally has long ago been set to require a detailed and searching investigation by a creditor when it receives a consumer's FCRA dispute through a CRA.

143.    PNC was aware of the *Johnson v. MBNA* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding the Plaintiffs' dispute.

144.    On information and belief, the Plaintiffs allege that the procedures followed regarding the Plaintiffs' FCRA disputes through e-Oscar were the procedures that PNC intended its employees or agents to follow.

145.    On information and belief, the Plaintiffs alleges that PNC's employees or agents did not make a mistake (in the way in which he or she followed PNC's procedures) when he or she received, processed and responded to the CRAs' ACDVs.

146.    On information and belief, the Plaintiffs allege that PNC has not materially changed its FCRA investigation procedures after learning of their failures in this case.

147.    In the alternative, PNC was negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

148.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from PNC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

**COUNT FOUR: VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)(B)**
*(PNC)*

149.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint (particularly though not limited to as pled in the "Fact" section of the Complaint and the previous Count).

150.    On one or more occasions within the past two years, by example only and without limitation, PNC violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer report agencies.

151.    As Plaintiffs detailed in Count Three, PNC has elected to use the e-Oscar system for its FCRA disputes received through the CRAs.

152.    PNC is aware of the meaning of the several dispute codes used by the CRAs in e-Oscar.

153.    PNC does not contend that the ACDV system is an inadequate means to receive FCRA disputes through the CRAs.

27

154.    PNC understood the Plaintiffs' disputes and that she was not delinquent on her mortgage obligations from March 2009 through the present.

155.    Nevertheless, PNC ignored such information and instead simply regurgitated the same information it had previously reported to the CRAs.

156.    As a result of PNC's violations of 15 U.S.C. §1681s-2(b)(1)(B), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

157.    The violations by PNC were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, PNC was negligent, which entitles Plaintiffs to recover under 15 U.S.C. §1681o.

158.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from PNC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT FIVE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1)(C) and (D)
### (*PNC*)

159.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint (particularly though not limited to as pled in the "Fact" section of the Complaint and the previous two Counts).

160.    On one or more occasions within the past two years, by example only and without limitation, PNC violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the PNC's representations within Plaintiffs' credit files with Equifax, Experian and Trans Union without

also including a notation that these debts were disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

161.    Specifically, PNC failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms when it responded to the CRAs.

162.    On information and belief, the Plaintiffs allege that PNC rarely if ever adds the XB code or other notation that an account is disputed when it responds to e-Oscar ACDVs.

163.    Furthermore, PNC knew that the Plaintiffs disputed the subject account because had filed the lawsuit in the Fairfax County Circuit Court and lodged a complaint with the Consumer Financial Protection Bureau.

164.    The Plaintiffs' disputes were bona fide as reflected by the pleadings submitted by PNC as well as its response to the Consumer Financial Protection Bureau, which asserted that the foreclosure sale was valid.

165.    As a result of PNC violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

166.    The violations by PNC were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

167.    PNC was aware of the *Saunders v. B.B. and T*, FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding the Plaintiffs' dispute.

168.    On information and belief, the Plaintiffs alleges that the procedures followed regarding the Plaintiffs' FCRA disputes through e-Oscar were the procedures that PNC intended its employees or agents to follow.

169.    On information and belief, the Plaintiffs alleges that PNC's employee or agent did not make a mistake (in the way in which he or she followed PNC's procedures) when he or she received, processed and responded to the CRAs' ACDVs and did not include the XB code in the CCC field.

170.    On information and belief, the Plaintiffs alleges that PNC have not materially changed its FCRA investigation procedures regarding the CCC field in ACDVs after learning of its failures in this case or any of the previous cases mentioned in this Amended Complaint.

171.    In the alternative, PNC was negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

172.    Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from PNC in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT SIX: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. §1681b
### (*EQUIFAX, EXPERIAN and TRANS UNION*)

173.    Plaintiffs reiterate and incorporate the allegations above as if fully set out herein.

174.    Defendants, Equifax, Experian and Trans Union violated 15 U.S.C. §1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiffs' credit report and credit files it published and maintained.

175.    As a result of the conduct, actions and inactions of each of the Defendants, Equifax, Experian and Trans Union, the Plaintiffs suffered actual damages including without limitation, by example only and as described herein on Plaintiffs' behalf by counsel:   credit damage, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

176.    Equifax, Experian and Trans Union's conduct actions and inactions were willful, rendering each Defendant individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian and Trans Union were negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

177.    The Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Equifax, Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT SEVEN: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681i(a)(1)
### (*EQUIFAX, EXPERIAN, TRANS UNION*)

178.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

179.    Defendants, Equifax, Experian and Trans Union each violated 15 U.S.C. §1681i(a)(1) on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiff's credit file.

180.    As a result of the conduct, actions and inactions of the Defendants, Equifax, Experian and Trans Union, the Plaintiffs suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:   credit damage, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

181.    Defendants, Equifax, Experian and Trans Union's conduct, actions and inactions were willful rendering each Defendant individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative Defendants, Equifax, Experian and Trans Union were negligent, which entitles Plaintiff to recovery under 15 U.S.C. §1681o.

182.    The Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Defendants, Equifax, Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT EIGHT: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a)(2)(A)
### *(EQUIFAX, EXPERIAN AND TRANS UNION)*

183.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

184.    Defendants, Equifax, Experian and Trans Union each violated 15 U.S.C. §1681i(a)(2)(A) on multiple occasions by failing to provide PNC with all the relevant information regarding Plaintiffs' disputes.

185.    As a result of the conduct, actions and inactions of the Defendants, Equifax, Experian and Trans Union, the Plaintiffs suffered actual damages including without limitation,

by example only and as described herein on Plaintiffs' behalf by counsel: credit damage, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

186.    Defendants, Equifax, Experian and Trans Union's conduct, actions and inactions were willful, rendering each Defendant individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Defendants, Equifax, Experian and Trans Union were negligent entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

187.    The Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Defendants, Equifax, Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT NINE: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681i(a)(4)
### (*EQUIFAX, EXPERIAN AND TRANS UNION*)

188.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

189.    Defendants, Equifax, Experian and Trans Union each violated 15 U.S.C. §1681i(a)(4) on multiple occasions by failing to review and consider all relevant information submitted by Plaintiffs.

190.    As a result of the conduct, actions and inactions of Defendants, Equifax, Experian and Trans Union, the Plaintiffs suffered actual damages including without limitation, by example only and as described herein on Plaintiffs' behalf by counsel:  credit damage, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

191.    Defendants, Equifax, Experian and Trans Union's conduct, actions and inactions were willful, rendering each Defendant liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative Defendants, Equifax, Experian and Trans Union were negligent, entitling Plaintiff to recover under 15 U.S.C. §1681o.

192.    The Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Defendants, Equifax, Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT TEN: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681i(a)(5)(A)
### *(EQUIFAX, EXPERIAN AND TRANS UNION)*

193.    Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

194.    Defendants, Equifax, Experian and Trans Union each violated 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiffs' credit files or modify the item of information upon a lawful reinvestigation.

195.    As a result of the conduct, actions and inactions of Defendants, Equifax, Experian and Trans Union the Plaintiffs suffered actual damages, including without limitation, by example only and as described herein on Plaintiffs' behalf by counsel:   credit damage, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

196.    Defendants, Equifax, Experian and Trans Union's conduct, actions and inactions were willful, rendering each Defendant individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative Defendants,

34

Equifax, Experian and Trans Union were negligent entitling Plaintiff to recover under 15 U.S.C. §1681o.

197.    The Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Defendants, Equifax, Experian and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

WHEREFORE, Plaintiffs demands judgment for actual, statutory and punitive damages against Defendant, jointly and severally; for their attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate, and such other relief the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**


Respectfully Submitted,

**SHIRLEY AND MICHAEL FADDEN**

By   /s/*Andrew J. Guzzo*
Counsel

Kristi Cahoon Kelly, VSB#72791
Andrew J. Guzzo, VSB #82170
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400 – Telephone
(703) 591-9285 – Facsimile
Email: kkelly@siplfirm.com
Email: aguzzo@siplfirm.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. 1-A
Newport News, VA 23601

(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

In addition, I hereby certify that on this 30th day of January, 2014, a true and correct

copy of the foregoing was also forwarded by electronic mail to the following:

Constantinos George Panagopoulos
Ballard Spahr LLP (DC)
1909 K Street NW
12th Floor
Washington, DC 20006
(202) 661-2202
Fax: (202) 661-2299
Email: cgp@ballardspahr.com
*Counsel for PNC Mortgage, a*
*Division of PNC Bank, N.A.*

Grant Edward Kronenberg
Morris & Morris PC
11 South 12th Street
5th Floor
PO Box 30
Richmond, VA 23218
804-344-6334
Fax: 804-344-8359
Email: gkronenberg@morrismorris.com
*Counsel for Trans Union, LLC*

Joseph W. Clark
Edward M. Wenger
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001
Email: jwclark@jonesday.com
Email: emwenger@jonesday.com
*Counsel for Defendant, Experian Information*
*Solutions*

John Willard Montgomery, Jr.
Montgomery & Simpson, LLLP
2116 Dabney Rd., Suite A-1
Richmond, VA 23230
Telephone: (804) 355-8744
Email: jmontgomery@jwm-law.com
*Counsel for Equifax Information Services*

_____ _/s/____ _____
Andrew J. Guzzo

36