**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **SHIRLEY FADDEN,** *et al.*, | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-00145-TSE-JFA |
| **PNC MORTGAGE,** *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT PNC MORTGAGE'S MOTION TO DISMISS**

COMES NOW the Plaintiffs, Shirley and Michael Fadden ("Plaintiffs"), by counsel, and for their Memorandum in Opposition to the Motion to Dismiss of Defendant PNC Mortgage ("Defendant" or "PNC"), they states as follows:

I.    **OVERVIEW**

This common law and federal Fair Credit Report Act ("FCRA") case[1] is prosecuted by the Plaintiffs, who suffered some of the worst imaginable damages as a result of Defendant PNC Mortgage's ("PNC") complete and utter disregard for its obligations under the law. In its simplest form, this case arises because PNC induced Plaintiffs into defaulting on their monthly mortgage payments under their Note and Deed of Trust for more than two years. During this two-year timeframe, PNC continuously misrepresented the status of Plaintiffs' application for a loan modification and wrongfully foreclosed on the Plaintiffs' home in April 2012, forcing them to commence a lawsuit in the Fairfax County Circuit Court in May 2012. Moreover, after it agreed

---

[1] Plaintiffs withdraw their claim with respect to Count II of the Amended Complaint asserting a claim for intentional infliction of emotional distress.

to rescind the sale in January 2013, PNC once again provided verbal and written assurances to the Plaintiffs that it would make a determination on their eligibility quickly and that no foreclosure sale would be scheduled while the Plaintiffs were under review for the modification. Despite these repeated written representations, PNC not only failed to make any determination over the course of ten months (all while it refused to accept Plaintiffs payments and charge them late fees and penalties), but it scheduled a foreclosure sale for November 7, 2013, without ever providing Plaintiffs' with a decision regarding their application.[2]

To make matters worse, while PNC was asserting the validity of the foreclosure sale in the Fairfax County Circuit Court, it was reporting to the Big 3 credit reporting agencies – Experian, Equifax, and Trans Union (the "CRAs") -- that Plaintiffs failed to make their monthly mortgage payments from April 2012 through January 2013. For example, PNC was reporting that Plaintiff missed their $2,592 mortgage payments from April 2012 through January 2013, that the balance of their loan exceeded $320,000.00, and that the past due amount was now $54,431 – all while their home was purchased by a company named AV Capital who was threatening to evict the Plaintiffs.

---

[2] It is important to reiterated what Plaintiffs already specified in the Introduction to the Amended Complaint – Plaintiffs' breach of implied duty of good faith and fair dealing claim does not allege that PNC (either under its Servicer Participation Agreement or any Trial Period Plan) was contractually required to offer the Plaintiffs a loan modification. By contrast, Plaintiffs contend that PNC acted arbitrarily, unreasonably, and with bad faith pursuant to the Note and Deed of Trust by inducing Plaintiffs to apply for HAMP and forego other loss mitigation alternatives, failing to evaluate the Plaintiffs' eligibility within the timeframes established by the HAMP guidelines and its own promises to the Plaintiffs (all while charging late fees and penalties), falsely representing to the Plaintiffs (after it conducted the unlawful foreclosure) that the loan modification was actually denied by Plaintiffs' investor, falsely representing that PNC needed more documents in order to evaluate the Plaintiffs for a modification, falsely representing that the Plaintiffs' property would not (again) be referred to foreclosure during the loan modification process, and scheduling a foreclosure (contrary to its representations) while the Plaintiffs were still being evaluated for a modification. (Am. Compl. ¶¶ 5-6).

2

After the Plaintiffs' disputed the information in their credit reports, PNC failed to conduct a detailed, substantive investigation demanded by the Fourth Circuit's seminal case, *Johnson v. MBNA*. 357 F.3d 426, 430-31 (2004)(holding that "the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," that it be "a searching inquiry," not just "superficial, unreasonable inquiries by creditors.")(emphasis in original). PNC not only failed to correct the information, but it also failed to notate that the debt was disputed as required by the Fourth Circuit's decision in *Saunders v. BB&T*. 526 F.3d 142, 150 (4th Cir. 2012) ("BB&T's decision to report the debt without any mention of a dispute was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect.'") (emphasis in original).

Plaintiff originally filed their thirty-three page on October 30, 2013. (See Compl.) (Docket #1). On January 16, 2014, Defendant filed its motion to dismiss arguing that the Complaint failed to state a claim for relief. (Docket No. 21, 22). In order to ease the burden on the Court and the parties, Plaintiffs amended their complaint to include additional facts detailing PNC's willful noncompliance with the FCRA, including more than a dozen cases filed against PNC under the FCRA. (Am. Compl. ¶¶ 102-109). Plaintiffs hoped this would make PNC rethink its motion because courts "have found assertions that a defendant repeatedly violated the FCRA sufficient to allege reckless – and, therefore, willful – misconduct." *Singleton v. Domino's Pizza*, LLC, 2012 WL 245965, at *4 (D. Md. Jan. 25, 2012); (citing *Smith v. HireRight Solutions, Inc.*, 711 F.Supp.2d 426, 435 (E.D.Pa. 2010) (finding that a plaintiff had sufficiently alleged willfulness where the complaint indicated that the defendant had repeatedly engaged in "objectionable conduct" by reporting a single criminal history incident multiple times on a consumer report—an assertion that could, "at minimum, rise to the level of reckless disregard"); *Romano v. Active Network, Inc.*, No. 09 C 1905, 2009 WL 2916838, at *3 (N.D.Ill. Sept. 3, 2009) (citing the plaintiff's assertion that

the defendant had repeatedly violated FACTA when concluding that the complaint's allegations of willfulness were sufficient to survive a motion to dismiss). PNC's history of FCRA violations was added to other sufficient facts in the original Complaint, such as PNC's failure to comply with the FCRA despite its awareness of its requirements. (Compl. ¶¶ 132-136, 157-158); *See Singleton*, 2012 WL 245965, at *4 (stating "assertions that a defendant was aware of the FCRA, but failed to comply with its requirements, are sufficient to support an allegation of willfulness and to avoid dismissal."); *Kubas v. Standard Parking Corp. IL*, 594 F.Supp.2d 1029, 1031–32 (N.D.Ill.2009) (denying a motion to dismiss where a plaintiff alleged that a defendant acted willfully by failing to comply with FACTA after credit card issuers had informed it of the law's requirements).

Despite the new allegations, PNC once again asks the Court to dismiss the FCRA allegations. The crux of PNC's argument is that Plaintiffs must allege facts showing that the steps PNC took to comply with the FCRA were based on an "objectively unreasonable" understanding of what was required under the circumstances. (Def.'s Mem. 15-16). This argument shows a misunderstanding of the Supreme Court's decision in *Safeco*, which established a "safe harbor" when a defendant's reasonably interprets "less-than-pellucid" statutory text. *Safeco Ins. Co of Am. v. Burr*, 551 U.S. 47 (2007). Unlike *Safeco*, where the statute at issue, 1681m(a), was "less-than-pellucid" and there was a "dearth of guidance," the statutory text at issue in this case has a plain and ascertainable meaning and the Fourth Circuit has spoken on the precise violations before the Court. *Safeco*, 551 U.S. at 70 (stating "[t]his is not a case in which the business subject to the Act had the benefit of guidance from the court of appeals or the Federal Trade Commission (FTC) that might have warned it away from the action it took. Before these cases, no court of appeals had spoken on the issue, and no authoritative guidance has yet to come from the FTC."). Furthermore, Defendant's other argument – that Plaintiff's failed to adequately plead actual damages – is not

supported by the factual allegations of the Complaint.

PNC also argues that the breach of implied covenant of good faith and fair dealing claim must be dismissed because: (1) the case law cited by Plaintiffs in the Amended Complaint only allows for such claim when the plaintiffs are induced into a default and (2) even if Virginia recognized, that PNC's exercise of its contractual rights is not a breach of the duty of good faith. (Def.'s Mem. 5). These arguments are unsupported by the factual allegations in the Complaint, Virginia law, and the limitations imposed by the limitations of a Rule 12(b)(6) motion.

## II.    FACTUAL BACKGROUND

Defendant supports its motion to dismiss by simply ignoring the salient facts and mischaracterizing others. In particular, Defendant devotes two pages of its brief to provide the Court with its version of the facts, which omit most of the relevant facts of the Amended Complaint. (Def.'s Mem. 6-8). Worse yet, PNC mischaracterizes almost all of the relevant facts that it did acknowledge. For example, Defendant asserts "[e]ventually, after the foreclosure avoidance discussions broke down, PNC foreclosed on the Property. (*See* Compl. ¶ 58)." (Def.'s Mem. 7). However, Paragraph 58 of the Amended Complaint, nor any of the other paragraphs indicate that "foreclosure avoidance discussions broken down." Instead, the Amended Complaint makes clear that PNC wrongfully foreclosed on the Property despite the discussions and representations otherwise. (Am. Compl. ¶¶ 45-58).

It is well settled that a court must accept as true all the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Whatever facts the court relies upon in reaching its decision, it must rely on the well-pled facts of the Complaint and reasonable inferences in favor of the Plaintiffs.

The pertinent facts as alleged in the Complaint are as follows:

**Facts Regarding Breach of the Implied Covenant**

1.      On or around July 14, 2003, Plaintiffs purchased their property located at 5209 Honeysuckle Court, Centreville, Virginia 20120 (the "Property"). (Am. Compl. ¶ 23).

2.      Plaintiffs had contacted PNC before May 19, 2011, to request hardship assistance due to the reduction of their income attributed to the struggles of Mr. Fadden's business. (Am. Compl. ¶¶ 37-38).

3.      After the Plaintiffs' submitted their application, PNC erroneously closed their file twice while they were under review – never giving the Plaintiffs a formal response on their qualifications. (Am. Compl. ¶ 44).

4.      In multiple correspondences from PNC Mortgage, Mr. and Mrs. Fadden were assured that no foreclosure sale would occur so long as they were under review for a loan modification. (Am. Compl. ¶ 47).

5.      Despite these representations, PNC scheduled a foreclosure sale while the Plaintiffs were under review, which occurred on April 4, 2012. (Am. Compl. ¶ 58).

6.      Before the sale occurred, Mr. Fadden was assured by an employee from PNC's underwriting department that "[the employee] would put a ten to thirty day extension on the file so no foreclosure sale would occur." (Am. Compl. ¶ 53).

7.      Prior to the foreclosure, Plaintiffs were never denied for their HAMP modification. (Am. Compl. ¶ 62).

8.      After the foreclosure, PNC mailed correspondence to the Plaintiffs dated April 9, 2012, which falsely represented that the modification was denied because the modification "was not approved by all required investors." (Am. Compl. ¶ 62).

9.      PNC's basis for its denial was entirely inaccurate and selected solely as a means to

cover up its mistake in conducting the unlawful foreclosure. (Am. Compl. ¶ 63).

10.     On May 24, 2012, the Plaintiffs filed an action against PNC in the Circuit Court for the County of Fairfax. (Am. Compl. ¶ 64).

11.     From the moment the Complaint was filed until January 2013, PNC asserted the validity of the sale. (Am. Compl. ¶¶ 66-68).

12.     PNC's position in the lawsuit was also consistent with its response to the Consumer Financial Protection Bureau dated June 19, 2012, where PNC, through counsel, indicated that "PNC Mortgage has reviewed [the Fadden's] file thoroughly and determined that the foreclosure sale was valid and it will not be rescinded." (Am. Compl. ¶ 69).

13.     Plaintiffs non-suited the lawsuit after written and verbal assurances that PNC would consider Plaintiffs for a loan modification and not foreclose (again) on the Property while Plaintiffs were under review. (Am. Compl. ¶ 71-73).

14.     For example, in a letter dated January 7, 2013, and consistent with its representations prior to the non-suit, PNC stated:

> You recently submitted information for application into the Making Home Affordable Program. In order to continue the review of your account for hardship assistance, there are specific documents required.
>
> …
>
> During the MHAP evaluation, the property will not be referred to foreclosure; or be sold at a foreclosure sale, if the foreclosure process has already been initiated.

(Am. Compl. ¶ 75).

15.     After agreeing to speak with the Plaintiffs, PNC indicated that it had all the documents that it needed and that it would make a determination on Plaintiffs eligibility within several weeks. (Am. Compl. ¶ 77).

16.     Based on their previous experience with the unlawful foreclosure, Plaintiffs diligently followed-up with PNC in February and March 2013 to inquire about the status of their loan modification. (Am. Compl. ¶ 78).

17.     During each communication, PNC representatives assured the Plaintiffs that their applications was under review and that PNC would provide the Plaintiffs with a determination very soon. (Am. Compl. ¶ 79).

18.     Despite PNC's repeated representations, it failed to make any determination whatsoever regarding the status of Plaintiffs' modification. (Am. Compl. ¶ 80).

19.     Instead, PNC continues to falsely represent that Plaintiffs need to submit additional, duplicative and unnecessary documents in order to be considered for a modification. Such requests occurred on or around January 7, 2013, February 8, 2013, February 27, 2013, March 12, 2013, March 26, 2013, April 22, 2013, May 16, 2013, June 25, 2013, September 17, 2013, and October 28, 2013. (Am. Compl. ¶ 80).

20.     Each time, Plaintiffs diligently submitted document after document requested by PNC, yet it continued to string them along and falsely represent a decision was coming soon and that the property would not be referred to foreclosure during the evaluation. (Am. Compl. ¶ 81).

21.     In fact, as late as October 28, 2013, Plaintiff mailed correspondence to the Plaintiffs that expressly stated "During the MHAP evaluation, the property will not be referred to foreclosure, or be sold at a foreclosure sale, if the foreclosure process has been initiated." (Am. Compl. ¶ 82).

22.     These repeated representations were utterly false as reflected by the correspondence from Samuel I. White, P.C. date October 15, 2013, which enclosed a notice of foreclosure sale of the Plaintiffs' property scheduled for November 7, 2013. (Am. Compl. ¶ 83).

**Factual Allegations Regarding Plaintiffs' FCRA Claims**

23.     In November 2012, Plaintiffs obtained a copy of their credit reports from Trans Union, Experian, and Equifax. All three CRAs were reporting inaccurate and incomplete information regarding Plaintiffs' mortgage account reported by PNC. (Am. Compl. ¶ 84).

24.     To that end, the credit reports inaccurately and incompletely stated that Plaintiffs were 120 days delinquent on their mortgage loan from April 2012 through November 2012. Moreover, PNC was reporting that Plaintiffs were $54,431 past due on their mortgage loan. (Am. Compl. ¶ 85).

25.     The credit reporting was inaccurate and incomplete as PNC had wrongfully foreclosed on the Plaintiffs' home and refused to accept Plaintiffs' monthly payments from April 2012 through November 2012. Moreover, it was inaccurate to report that Plaintiffs had a past due balance (or any balance whatsoever) because the home was currently foreclosed, had been purchased by a third party, and Plaintiffs were no longer required to make their $2,592 monthly mortgage payments during each of the months that PNC was reporting the Plaintiffs as delinquent. (Am. Compl. ¶ 86).

26.     In November 2012, Plaintiffs sent credit dispute letters to explaining that the information reported by PNC was inaccurate. In their letters, Plaintiffs explained that the account should not have a past due balance of $54,431 because PNC wrongfully foreclosed on the Plaintiffs' home and PNC would not let Plaintiff make any payments since that date. Plaintiffs further explained that it should not reflect that Plaintiffs did not pay their $2,592 monthly mortgage payment from April 2012 through November 2012 because PNC foreclosed on the home, continued to assert that the sale was valid, refused to accept payments on the loan, and never sent a single mortgage statement during this time requesting a payment. (Am. Compl. ¶ 88).

27.     In response to Plaintiffs' disputes, PNC verified to the credit reporting agencies that the current status of Plaintiffs' loan was reporting correctly, *i.e.*, that Plaintiffs were 120-149 days past due on their monthly mortgage payments from April 2012 through November 2012, that Plaintiffs had a current past due balance in excess of $58,233, and a balance in excess of $320,000. (Am. Compl. ¶¶ 88-90).

28.     Plaintiffs sent a follow-up dispute letter, including the documents filed by PNC to the CRAs in December 2012, once again disputing the PNC's reporting. (Am. Compl. ¶ 91). PNC once again verified its reporting to the CRAs. (Am. Compl. ¶¶ 92-94).

29.     After the Plaintiffs' disputes, PNC also failed to notate on the Plaintiffs' credit reports that the debts were disputed. (Am. Compl. ¶ 160).

30.     The credit reporting was incomplete and false. (Am. Compl. ¶ 95).

## III. ARGUMENT

### A. The Complaint contains sufficient detail to satisfy Rules 8(a)(2) and 12(b)(6).

Defendant supports its motion to dismiss by simply ignoring the salient facts alleged in the Complaint and disregarding the limitations of a Rule 12(b)(6) motion.  This Court recently summarized "the familiar standard for a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Engel v. Francis*, 2011 WL 797244, *1 (E.D.Va. Feb. 25, 2011). Plaintiff will not burden the Court with its repetition here. Suffice it to say that these detailed factual allegations must be accepted as true and, as shown below, demonstrate that Plaintiff has stated a claim under Virginia common law and FCRA for the relief they have requested.

The largest divide between the Plaintiffs' position and PNC arguments is the Parties' understanding of Rules 8(a)(2) and 12(b)(6). While PNC prefers a plaintiff to outline in full detail all facts that might be offered on summary judgment or at trial, a complaint actually satisfies Rule

8 if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In this case, Plaintiffs have alleged sufficient detail by which PNC can answer and by which the Court can determine the plausibility of their claims.

### B. The Complaint Sufficiently Alleges a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

The first count of the Complaint seeks damages based on Defendant's alleged breach of the implied covenant of good faith and fair dealing. In order to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) the existence of a contract; and (2) a breach of the implied covenant. *Enomoto v. Space Adventures, Ltd*., 624 F.Supp.2d 443, 450-51 (E.D. Va. 2009). Specifically, Plaintiffs allege that their Note and Deed of Trust are valid contracts, and like all contracts in Virginia, contains an implied covenant of good faith and fair dealing. (*See* Am. Compl. ¶ 5, 6, 111). Plaintiffs further allege that Defendant breached the implied covenants in the Note and Deed of Trust by, *inter alia*, inducing Plaintiffs to default on their mortgage for nearly two years while PNC evaluated them for a modification, by foreclosing on the home in April 2012 after PNC assured Plaintiffs that the foreclosure would not occur and Plaintiffs would be offered a modification; inducing them into applying for a HAMP loan modification after the wrongful foreclosure sale and misrepresenting that it would making a determination regarding Plaintiff's application quickly; failing to follow HAMP guidelines; failing to properly safeguard and maintain important documents provided by Plaintiffs; falsely representing to the Plaintiffs' loan modification was denied by Plaintiffs' investor in April 2012; falsely representing that PNC needed more documents in order to evaluate the Plaintiffs for a modification; falsely representing that the Plaintiffs' property would not (again) be referred to foreclosure during the loan modification process, and scheduling a foreclosure in November 2013

(contrary to its representations) while the Plaintiffs were still being evaluated for a modification. (*See* Compl. ¶¶ 5, 6, 112).

Despite these allegations, PNC puts forth two arguments in support of its motion to dismiss count two of the Complaint. First, PNC argues that the cases cited by Plaintiffs in support of their claim are inapposite and actually support PNC's motion to dismiss. (Def.'s Mem. 5). Second, Defendant hedges this position by further arguing that Plaintiffs' claim fails because "the 'actions taken by [PNC] merely amounted to an exercise of [its] contractual rights,' not a breach of the duty of good faith." These arguments are contradicted by Virginia law and the facts pled in the Complaint.

## 1. Plaintiff Plausibly Alleged a Breach of the Implied Covenant of Good-Faith and Fair Dealing in All Contracts.

As a threshold matter, PNC simply misrepresents and ignores the salient facts regarding Plaintiffs' claim for the breach of the implied covenant of good faith and fair dealing. (Def.'s Mem. 10). Instead, PNC asserts that Plaintiffs' claim is merely based on the fact that PNC foreclosed on the Plaintiffs' home while a loan modification was pending and nothing else. (Def.'s Mem. 10). Based on this misrepresentation of the facts, PNC then argues that the *Acuna* and *Bourdelais* cases involve entirely different factual scenarios because those cases involved allegation that the defendants' conduct "induced the plaintiffs to default on the loans at issue and then allegedly foreclosed on plaintiffs' homes while a loan modification was pending." (Def.'s Mem. 10). PNC asserts that this case is different because "Plaintiffs have not alleged that PNC induced them to default on their mortgage, only that it improperly cut short the loan modification process." *Id*.

PNC's extremely narrow reading of the Amended Complaint, *Acuna*, and *Bourdelais* is incorrect. The Court's holding in *Acuna* and *Bourdelais* was not limited to the one allegation suggested by PNC. Instead, in *Acuna*, the Court found that the plaintiff sufficiently alleged a claim

for breach of the implied covenant of good-faith and fair dealing based on four separate allegations.

In particular, the Court wrote:

> Because Acuna alleges Chase breached the implied covenant of good faith and fair dealing by: (1) inducing him to default by telling him his chances of receiving a loan modification would increase if he did so; (2) falsely assuring Acuna about the status of his modification; (3) falsely assuring Acuna the home would not be sold at the foreclosure sale; and (4) failing to follow HAMP guidelines, he has stated a claim for breach of contract based on breach of the implied covenant of good faith and fair dealing. Accordingly the Motion to Dismiss is denied with respect to Count III.

*Acuna*, 2011 WL 1883089, at *6. Similarly, in *Bourdelais*, the Court wrote:

> The Fourth Amended Complaint lists ten ways in which Chase allegedly violated the implied covenant, but the Court will focus its attention on the first three allegations. First, Chase "falsely inform[ed] her that she had to be in default on her mortgage in order to be considered for a loan modification under HAMP." Second, Chase "falsely inform[ed] her that since she was current on her mortgage, she would have to miss a payment in order to qualify for HAMP." (Id.) Third, Chase "induc[ed] her into a HAMP loan modification and Trial Payment Plan without disclosing that [Chase] would consider the reduced monthly payment to be a delinquency or default that would place the loan into arrears and would trigger foreclosure." (Id.) For the reasons discussed below, the Court finds the facts alleged are sufficient to state a claim for relief and will not dismiss Count One.

*Bourdelais*, 2012 WL 5404084, at *3. Thus, PNC's reliance and selective reading of *Acuna* and *Bourdelais* is unavailing. It is not surprising, however, given the fact that the Amended Complaint alleges much of the same conduct that the Court found sufficient in *Acuna* and *Bourdelais*. (*See* Am. Compl. ¶ 5, 112) *see also Gudym v. Bank of America, N.A.*, Civil Action No. 3:12-cv-00275 (Docket No. 27) (Trenga, J.) (denying Bank of America's Rule 12(b)(6) motion without oral argument because the plaintiff alleged facts sufficient to make her claims sufficiently plausible). Accordingly, when properly cited, the above case law reflects that Plaintiffs more than adequately alleged a claim in Count I of the Amended Complaint.

### 2. PNC's Right to Foreclose Does Not Form the Basis of Plaintiff's Claim for Breach of the Implied Covenant.

PNC next argues that the duty of good-faith does not prevent a party from exercising its contractual rights. (Def.'s Mem. 11). Of course, Plaintiffs do not disagree with this legal conclusion, but it is inapplicable in this case based on a cursory review of the salient facts in the Amended Complaint. Contrary to the assertion of the PNC, it is *not* "PNC's contractual right to foreclose that is at issue here," but rather PNC's arbitrary and unreasonable conduct during the past three years. In fact, the Amended Complaint even states that Plaintiffs' claim does not allege that PNC was contractually required to offer the Plaintiffs a loan modification. (Am. Compl. ¶ 6). Yet, when it decided to evaluate Plaintiffs' loan for a modification, it acted arbitrarily, unreasonably, and in bad-faith through, *inter alia*, its misrepresentations regarding the timeframes in which it would make a decision, misrepresentations in April 2012 that Plaintiffs were denied the loan modification because their investor did not participate in HAMP, and falsely representing (on numerous occasions in writing) that the property would not be referred to foreclosure during the loan modification process. (Am. Compl. ¶¶ 5, 6, 77-83, 112).

Defendant also selectively quotes this Court's decision in *SunTrust* as authority for its argument that enforcing a contractual right is not bad faith. (Def.'s Mem. 10-11). As reflected above, this argument not only ignores the facts in the Amended Complaint, but was also rejected by the Court based on weaker allegations in *Suntrust*. Finding that the party adequately alleged a claim for breach of the implied covenant of good faith and fair dealing, Judge Hudson wrote:

> Here, Mortgages has properly pleaded its Counterclaim because it does not seek redress simply through an allegation that SunTrust exercised an explicit contractual right. Instead, Mortgages alleges that although the default, foreclosure, and sale of the underlying property occurred around September of 2009, SunTrust failed to notify Mortgages until 2011. According to SunTrust's original Complaint, the Agreement between the parties obligates Mortgages to repurchase any loan in default within ten days of SunTrust's repurchase demand. Mortgages argues that SunTrusts's failure to timely notify it of the alleged default, foreclosure, and sale of the underlying property adversely impacted Mortgages "ability to recoup its losses"

and was contrary to its expectations. Furthermore, Mortgages avers that SunTrust failed to recoup its losses and, after overpaying Fannie Mae, demanded the inflated sum from Mortgages. At this early stage of litigation, therefore, Mortgages' Counterclaim adequately alleges that SunTrust acted unreasonably and in bad faith.

*SunTrust Mortg*, 2012 WL 1942056, at *3

It is apparent from the Amended Complaint that the factual allegations supporting Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing are not based on any express terms of the Note or Deed of Trust. Rather, it is based on PNC's conduct inviting and encouraging Plaintiffs to apply for a loan modification and trial period plan without disclosing to the Plaintiffs that PNC would consider the reduced monthly payments as a delinquency that would trigger a foreclosure, failing to evaluate the Plaintiffs' eligibility within the timeframes established by the HAMP guidelines and its own promises to the Plaintiffs (all while charging excessive fees and penalties), falsely representing that PNC needed more documents in order to evaluate the Plaintiffs for a modification (thereby repeatedly delaying the determination and increasing fees and penalties), wrongfully foreclosing on the Plaintiffs' property after numerous representations that a foreclosure sale would not occur, falsely representing to the Plaintiffs (after it conducted the unlawful foreclosure) that the loan modification was actually denied by Plaintiffs' investor. (Am. Compl. ¶¶ 5, 6, 77-83, 112). Then even after Plaintiffs filed a lawsuit to rescind the foreclosure sale and PNC once again promised to evaluate the Plaintiffs for a loan modification, it still proceeded to take more than ten months to evaluate Plaintiffs for a loan modification, which was contrary to its representations and HAMP guidelines. (Am. Compl. ¶ 80). Worse yet, despite numerous written representations that "[d]uring the HAMP evaluation, the property will not be referred to foreclosure, or be sold at a foreclosure sale, if the foreclosure process has been initiated," PNC scheduled a foreclosure sale for November 7, 2013 without ever making a decision regarding Plaintiffs' application. (Am. Compl. ¶ 82-83).

Based on the aforementioned case law and the salient facts ignored by PNC, the Court should deny Defendant's motion to dismiss.

### C. The Complaint Sufficiently Alleges a Claim under the FCRA.

#### 1. Overview

Congress enacted the FCRA in 1970 as Title VI of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r ("CCPA"), its omnibus act regulating the consumer credit industry. An overarching, core CCPA theme is that prudent dissemination of accurate credit information is essential to maintain the vitality of the credit granting system in a competitive and open marketplace to insure the health of the nation's multi-trillion dollar consumer credit economy and the wellbeing of all its participants, creditors and consumers alike. Congress thus made the following formal findings in adopting the FCRA:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system. § 1681(a)(1).

15 U.S.C. § 1601(a). Congress enacted the FCRA with the express purpose to enable credit grantors and others to be in the best position to make reliable lending and other business decisions. § 1681(a) and (b). Likewise, the Truth in Lending Act, Title I of the CCPA, establishes the corresponding principle that consumers are best served through their own "informed use of credit." 15 U.S.C. "Congress enacted the Truth in Lending Act in part because it believed consumers would individually benefit not only from the more informed use of credit, but also from heightened competition which would result from more knowledgeable credit shopping." *Till v. SCS Credit Corp.*, 541 U.S. 465, 482 (2004) (quotation and footnote omitted). The Supreme Court stated the guiding principle of this congressional philosophy nearly 40 years ago: "[B]lind economic activity is inconsistent with the efficient functioning of a free economic system such as ours." *Mourning*

*v. Family Publication Serv., Inc.*, 411 U.S. 356, 364 (1973).  Simply put, the viability of our credit economy depends on accurate information; Congress designed the FCRA to increase that accuracy.

In 1996 Congress amended the FCRA, Pub.L. 104-208 (Sept. 30, 1996), as explained in the Senate Report:

> Currently, the FCRA contains no requirements applying to those entities which furnish information to consumer reporting agencies.  Section 413 imposes certain obligations upon those furnishers of information to consumer reporting agencies. The Committee believes that bringing furnishers of information under the provisions of the FCRA is an essential step in ensuring the accuracy of consumer report information.

S. Rep. 104-185, 104th Cong., 1st Sess. 49 (1995); see *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002).  Among the changes that Congress enacted was § 1681s-2, which imposes on those furnishers of information, such as PNC, detailed and specific responsibilities.

This Court has long ago provided one of the earliest and most complete summaries of this FCRA "furnisher" section, which governs the present case, cited verbatim:

> The FCRA places various requirements on consumer credit reporting agencies, furnishers of credit information to consumer credit reporting agencies, and users of consumer credit reports. These requirements are enforced by civil liability statutes and, depending on the statutes implicated, may be enforced by either appropriate government officials or private individuals and entities. Sections 1681n and 1681o are examples of the latter. Section 1681n provides that "any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of any damages sustained by that consumer ... or not less than $1000" plus reasonable attorney's fees. 15 U.S.C.S. § 1681n. Section 1681o establishes similar liability for any person who negligently fails to comply.
>
> Section 1681s–2 may be functionally split into two distinct subparts. First, subsections (a), (c), and (d), delineate the following responsibilities. Subsection (a) imposes duties upon furnishers of credit information to provide consumer reporting agencies with accurate information. Subsections (c) and (d), limit the remedies available for violations of subsection (a). In particular, subsection (c) eliminates the availability of direct remedies to consumers by making Sections 1681n and 1681o inapplicable to violations of subsection (a). Subsection (d) provides that the requirements imposed by subsection (a) are only enforceable by government

17

officials.

*Ayers v. Equifax Info. Servs.*, No. 3:03CV551, 2003 WL 23142201 (E.D. Va. Dec. 16, 2003). As currently enacted, § 1681s-2(b) requires:

**(b) Duties of furnishers of information upon notice of dispute**

**(1) In general**

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—

**(A)** conduct an investigation with respect to the disputed information;

**(B)** review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

**(C)** report the results of the investigation to the consumer reporting agency;

**(D)** if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

**(E)** if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

**(i)** modify that item of information;
**(ii)** delete that item of information; or
**(iii)** permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b).

The Amended Complaint more than satisfies these requirements. In particular, Plaintiffs allege: (1) that they mailed separate letters on two occasions to Experian, Equifax, Trans Union explaining that PNC was reporting inaccurate information within their credit files (Am. Compl. ¶¶ 88, 91); (2) that "[b]ased on the manner in which Equifax, Experian and Trans Union responded

to the Plaintiffs' disputes, representing that PNC had 'verified' the supposed accuracy of its reporting, Plaintiffs allege that Equifax, Experian and Trans Union did in fact forward the Plaintiffs' dispute via an ACDV to PNC" (Am. Compl. ¶ 135); and (3) PNC did not conduct a substantive review of any sort or modify the inaccurate information. (Am. Compl. ¶¶ 107, 139).

Defendant suggests that in order to establish a claim under § 1681s-2(b), Plaintiff need also affirmatively plead the details of how and when the consumer reporting agency delivered the consumer dispute to PNC.   First, as offered supra, Plaintiffs have more than pled such a fact.  (Am. Compl. ¶ 135),  Beyond this reality, the Court should also find as have other courts considering the same question, that a reasonable inference can be drawn that such dispute was conveyed by the agency sufficient to render a consumer § 1681s-2(b) claim plausible.  *Shulick v. Experian*, No. 11–3809, 2011 WL 4346335 (E.D.Pa. Sept.16, 2011); *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F.Supp.2d 356 (E.D.Pa.2001).

### 2.  Plaintiffs Adequately Pled a Willful Violation of the FCRA.

PNC's alternate position in support of its motion to dismiss the FCRA claims is predicated on PNC's erroneous assertion that Plaintiff's failed to properly plead that PNC willfully violated the FCRA. Defendant's argument is based on an erroneous view of the Supreme Court's decision in *Safeco* and ignores the allegations in the Amended Complaint. Before addressing the flaws in Defendant's *Safeco* argument, it is important to begin by acknowledging that the Plaintiffs' Amended Complaint contains more than conclusory assertions of PNC's willful noncompliance of the FCRA. Instead, the Amended Complaint provides at least three examples of PNC's specific conduct, including conduct that other courts have found satisfies Rule 8's notice pleading standard.

First, courts have repeatedly found at the Rule 12(b)(6) stage that "assertions that a defendant repeatedly violated the FCRA sufficient to allege reckless—and, therefore, willful—

misconduct." *Singleton*, 21012 WL 245965, at *4; *Romano*, 2009 WL 2916838, at *3 (citing the plaintiff's assertion that the defendant had repeatedly violated FACTA when concluding that the complaint's allegations of willfulness were sufficient to survive a motion to dismiss). In the Amended Complaint, Plaintiffs assert that PNC violated the FCRA, including at least thirteen lawsuits placing PNC on notice regarding its FCRA problems. (Am. Compl. ¶ 113). PNC's recidivist history of cases is sufficient evidence alone to deny Defendant's motion to dismiss.

Second, courts have also ruled that assertions that the "defendant was aware of the FCRA, but failed to comply with its requirements, are sufficient to support an allegations of willfulness." *Singleton*, 21012 WL 245965, at *4-5 ("Plaintiffs assert that Domino's was aware—through its "general counsel's office and outside employment counsel"—that the FCRA requires employers to provide employees with copies of background checks before taking adverse action against them. (ECF No. 19 ¶ 65). According to the complaint, Domino's disregarded the FCRA by "typically" failing to provide employees with copies of their background checks."); s*ee also Kubas*, 594 F.Supp.2d at 1031–32 (denying a motion to dismiss where a plaintiff alleged that a defendant acted willfully by failing to comply with FACTA after credit card issuers had informed it of the law's requirements); *see also Zaun v. Tuttle, Inc*., 2011 WL 1741912, at *2 (concluding that a plaintiff had sufficiently alleged willfulness by asserting that the defendant was aware of FACTA's requirements, via information provided by a trade association, had the ability to comply with those requirements, and simply decided not to do so). Plaintiff's make similar allegations in this case, including that "PNC was aware – through its previous lawsuits and general counsel – that the FCRA requires furnishers (such as PNC) to conduct a 'detailed inquiry or systematic examination" of the Plaintiffs' disputes. (Am. Compl ¶ 106). Such allegations are consistent with the case law above and undoubtedly satisfy Rule 8.

Third, courts "can reasonably infer that [a defendant's] repeated engagement in the same type of objectionable conduct without justification could, at minimum, rise to a level of reckless disregard." *Smith*, 711 F.Supp.2d at 435 (citing *Sheffer v. Experian Info. Solutions, Inc.*, 2003 WL 21710573, at *3 (E.D.Pa. Jul. 24, 2003) (noting that a willful violation may be found "where the evidence shows that inaccuracies in credit reports arise from something more than 'an isolated instance of human error which [the agency] promptly cure[s].'"). As reflected by the allegations in the Amended Complaint, Defendant's failure to correct its reporting on multiple occasions arise from something more than an isolated human error. PNC had at least six different occasions to correct Mrs. Fadden's credit report and six separate occasions to correct Mr. Fadden's credit reports. (Am. Compl. ¶¶ 88-94, 105). Furthermore, PNC had the same number of opportunities to mark the account as disputed as required by the Fourth Circuit's decision in *Saunders*, but it failed to do so. (Am. Compl. ¶¶ 160-162). Thus, Plaintiffs more than adequately alleged repeated conduct to rise to a level of recklessness.[3]

And of course, even in this Court and this Circuit, the Court of Appeals has found a willful violation even by the mere failure to notate a credit account as disputed, in response to one communication through the CRAs. *Saunders*, 526 F.3d at 151 (finding that a reasonable jury could

---

[3] Moreover, as acknowledged by the court in *Smith*, "The mere fact that Plaintiff cannot, at this juncture, either articulate any particular procedures or policies that Defendant internally maintains or describe alternative procedures that Defendant should have considered or adopted is not fatal to the claim. Rather, such matters are particularly within the knowledge of Defendant and Plaintiff is not expected to plead such matters with specificity absent the benefit of discovery." In addition, courts have routinely found that "the willfulness issue cannot always be resolved at the motion to dismiss stage since it may involve facts beyond the pleadings. *See, e.g.*, *Troy v. Home Run Inn, Inc.*, 2008 WL 1766526, at *2 (N.D.Ill.2008) (finding that the plaintiff had alleged sufficient facts regarding willfulness under the notice pleading standard); In re TJX Companies, Inc., 2008 WL 2020375, at *2 (D.Kan.2008) (finding that plaintiff alleged sufficient allegations of willfulness); *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1210 (C.D.Cal.2007) (stating that "[w]illfulness under the FCRA is generally a question of fact for the jury").

conclude that BB&T willfully violated the FCRA based on evidence that: (1) BB&T's records reflected the ongoing dispute over the debt; (2) BB&T's reports to the CRAs did not reflect that ongoing dispute; and (3) BB&T intended not to report the ongoing dispute."). A failure to do a substantive investigation is also plausibly willful. *See Mullins v. Equifax Information Services, LLC*, 2007 WL 2471080 (E.D. Va. 2007). Accordingly, the Court should deny Defendant's motion to dismiss the FCRA claims because the Amended Complaint more than adequately alleges a willful violation of the FCRA.

### 3.   Defendant's Reliance on *Safeco* is Misplaced.

In its memorandum, Defendant argues that the violations of the FCRA must be dismissed "because Plaintiffs have not and cannot allege facts showing that PNC's conduct was objectively unreasonable – the standard set [forth] by the Supreme Court in *Safeco*." (Def.'s Mem. 4). This argument shows a complete misunderstanding of *Safeco*, which established a "safe harbor" when a defendant's reasonably interprets "less-than-pellucid" statutory text. *Safeco*, 551 U.S. 47 (2007). In the instant case, PNC's conduct is not entitled to the "shelter in Safeco's safe harbor" because the statutory text at issue is plain and the Fourth Circuit's decision in *Johnson* and *Saunders* provides definitive guidance on the violations of the FCRA alleged in the Amended Complaint. *See Fuges v. Southwest Financial Servs. Ltd.*, 707 F.3d 241 (3rd Cir. 2012); *see also Dreher v. Experian Information Solutions, Inc.*, 2013 WL 2389878, at *4 (E.D. Va. 2013) (stating "[i]n short, if Experian's 'reading of the statute, albeit erroneous, was not objectively unreasonable,' then it did not willfully violate the FCRA."). Thus, Defendant's decision to include inaccurate information within the Plaintiff's credit reports and its failure to notate the accounts as disputed, was objectively unreasonable under the plain language of § 1681s-2(b) and the Fourth Circuit's clear guidance in *Johnson* and *Saunders*.

It is also significant to point out that PNC's *Safeco* argument is not only inapplicable in this case, but it is improperly raised at the Rule 12(b)(6) posture of the case. PNC's *interpretation* of the statutory text of § 1681s-2(b) – as erroneous as it is – is immaterial where "the Court's only role is to determine whether the *complaint* is sufficient." *Korman v. The Walking Co.*, 503 F.Supp.2d 755, 762–63 (E.D. Pa. 2007) (emphasis in original) (rejecting defendant's imploration of the court on a Rule 12 (b)(6) motion to determine whether PNC's interpretation was "reasonable" under *Safeco*.). Courts across the country have uniformly rejected defendants' efforts to use *Safeco's* safe harbor at a Rule 12(b)(6) stage. *See also Follman v. Village Squire, Inc.*, 542 F.Supp.2d 816, 820 (E.D. Ill. 2007) (stating "[t]he second argument, addressing VSI's interpretation of the statute, is not one the Court will address at this stage; '[o]n a motion to dismiss we are concerned only with the sufficiency of the complaint and defendant's argument goes beyond the complaint, asking us to consider its interpretation of the statute.'"); *Smith*, 711 F.Supp.2d at 436.

In sum, PNC's argument suffers from the same two flaws identified by United States District Court in Maryland in *Singleton*, which found:

> The company's reliance on *Safeco*, however, is misplaced for two reasons.
>
> First, the procedural posture of the *Safeco* case differed in a critical manner from the present action. [T]he Supreme Court [in Safeco] was operating under a summary judgment standard of review. It found no genuine issue of material fact as to whether the defendant's interpretation of the statute—albeit erroneous—was objectively unreasonable. ***In this case, however, a motion to dismiss is pending, and discovery has not yet begun. Thus, at present, there is no evidence that Domino's actually adopted the interpretation of § 1681b(b)(2) that it proposes here. On similar facts, numerous courts have declined to examine the reasonableness of a defendant's statutory interpretation when ruling on motions to dismiss.***
>
> Second, even if it were appropriate to reach this issue on a 12(b)(6) motion, ***Domino's would not prevail. Unlike in Safeco, where the FCRA provision at issue was "less-than-pellucid," the text at issue here appears to have "a plain and***

> *clearly ascertainable meaning," Domino's has pointed to no authority that would lead to a contrary conclusion.*

*Singleton*, 2012 WL 245965, at *9-10 (emphasis added) (internal citations and quotations omitted).

Accordingly, PNC's argument that its conduct was objectively reasonable is not only procedurally inappropriate, but also substantively without merit.

### 4. Defendant's Request for Dismissal of Count V for a Violation of § 1681s-(2)(b)(C)-(D) Reflects a Complete Misunderstanding of the Law in this Circuit and the Fourth Circuit's Opinion in *Saunders*.

If there is any issue before this Court that it can measure the creditability of the FCRA arguments raised by PNC, it is PNC's argument that Count V of the Complaint should be dismissed because PNC actually complied with § 1681s-2(b)(1)(C) and (D). (Def.'s Mem. 21). In particular, Defendant writes:

> In Count V, Plaintiffs allege that PNC failed to inform the Bureau Defendants that Plaintiffs disputed the debt it was reporting. This, *according to Plaintiffs*, was a violation of 15 U.S.C. § 1681s-2(b)(1)(C)(D). Yet Plaintiffs' own allegations demonstrate that PNC complied with these provisions of [*sic*] FCRA.

(Def.'s Mem. 21) (emphasis added). Of course, the failure to mark an account as disputed is not just a violation of the FCRA *according to the Plaintiffs*, but is the binding precedent in the Fourth Circuit as established by *Saunders v. BB&T*. 526 F.3d 142, 150 (4th Cir. 2012) ("BB&T's decision to report the debt without any mention of a dispute was 'misleading in such a way and to such an extent that it can be expected to have an adverse effect.'") (emphasis in original); *see also Seamans v. Temple University*, --- F.3d ---, 2014 WL 658401, *10 (3rd Cir. 2014) ("We agree with this assessment [in *Saunders* and *Gorman*], and conclude that a private cause of action arises under 15 U.S.C. § 1681s–2(b) when, having received notice of a consumer's potentially meritorious dispute, a furnisher subsequently fails to report that the claim is disputed."); *Gorman v. Wolfpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009) (stating "[t]he Fourth Circuit has recently held that

after receiving notice of dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under § 1681s–2(b).”). In reaching this conclusion, the Fourth Circuit stated in relevant part:

> BB & T would have us create a *per se* rule that furnishers are never obliged to report affirmative defenses or consumer disputes, regardless of how meritorious the dispute may be. Such a rule would be ill-advised. Certainly, if a consumer has a meritorious dispute—as the jury concluded Saunders did here—the consumer's failure to pay the debt does not reflect financial irresponsibility. Moreover, some courts have concluded that a disputed debt differs materially from an undisputed debt even if the consumer would not succeed at a trial of the dispute. *See, e.g.*, Alexander, 553 F.Supp. at 954 (arguing that consumer's dispute of default on debt, even predicated upon an invalid legal defense, is relevant if the underlying default is relevant). The *per se* rule suggested by BB & T would result in numerous reports with omissions that are “misleading in such a way and to such an extent that [they] can be expected to have an adverse effect.” *Dalton*, 257 F.3d at 415 (quotations and modifications omitted).
>
> Nor do we find persuasive BB & T's contention that a furnisher's reporting of an ongoing dispute of a debt is superfluous once a consumer has filed a dispute with any CRA. Among other things, when a furnisher reports a dispute, its report confirms that the consumer has actually contacted the furnisher and explained that the consumer believes he does not owe the debt. Moreover, Saunders presented evidence that, in the course of business, CRAs do not consider the furnisher's reporting of a dispute superfluous. For instance, when a furnisher responds to a dispute verification form and relates an ongoing dispute, Trans Union records the dispute in the credit report and does not include the derogatory information in assessing the credit score.
>
> In sum, given the evidence before it, the jury could reasonably conclude that BB & T's decision to report the debt without *any* mention of a dispute was “misleading in such a way and to such an extent that it can be expected to have an adverse effect.” *Id*. The district court did not err in so holding.

*Id*. at 150 (emphasis in original). *Saunders* was also adopted by the Ninth Circuit in *Gorman*, which stated in relevant part:

> Gorman does have a private right of action, however, to challenge MBNA's subsequent failure to so notify the CRAs after receiving notice of Gorman's dispute under § 1681s–2(b). In addition to requiring that a furnisher conduct a reasonable investigation of a consumer dispute, § 1681s–2(b) also requires a creditor, upon receiving notice of such dispute, to both report the results of the investigation and, “if the investigation finds that the information is incomplete or inaccurate, report

those results" to the CRAs. § 1681s–2(b)(1)(C), (D). Gorman argues that MBNA's reporting of the Four Peaks charge and delinquency, without a notation that the debt was disputed, was an "incomplete or inaccurate" entry on his credit file that MBNA failed to correct after its investigation. As this claim alleges that obligations imposed under § 1681s–2(b) were violated, it is available to private individuals.

The Fourth Circuit has recently held that after receiving notice of dispute, a furnisher's decision to continue reporting a disputed debt without any notation of the dispute presents a cognizable claim under § 1681s–2(b). *See Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir.2008). In *Saunders*, a consumer alleged that he incurred late fees and penalties as a result of a creditor's own admitted accounting errors; the creditor, Branch Banking & Trust (BB & T), refused to waive the fees, and the consumer responded by withholding payments on the loan. *Id*. at 145–46. BB & T reported the loan to the CRAs as "in repossession status," and, after suffering adverse credit decisions, the consumer contacted the CRAs to report the dispute. *Id*. at 146. The CRAs sent a notice of dispute to BB & T, triggering its obligations to investigate and verify the accuracy of the reported information under § 1681s–2(b)(1). BB & T responded by updating the consumer record to reflect that it had written off the debt as uncollectible, but failed to indicate that the consumer still disputed the validity of the obligation. *Id*. The consumer *1163 brought suit under § 1681s–2(b) and a jury found that BB & T had violated its obligations.

…

This reasoning is persuasive… As the Fourth Circuit observed, holding otherwise would create a rule that, as a matter of law, an omission of the disputed nature of a debt never renders a report incomplete or inaccurate. *See Saunders*, 526 F.3d at 150. Not only might such a rule intimidate consumers into giving up bona fide disputes by paying debts not actually due to avoid damage to their credit ratings, but it also contravenes the purpose of the FCRA, to protect against "unfair credit reporting methods."

*Gorman*, 584 F.3d 1162-1163. Based on this established law, PNC's assertion -- that § 1681s-2(b)(1)(C) and (D) does not require PNC to notate the account as disputed -- is as shocking as it is wrong.

### 5.   PNC's Argument Suffers From a Mistaken Assumption That There Were Only Two Possible Ways to Report the Plaintiffs' Loan.

Throughout its memorandum, PNC repeatedly asserts that its reporting did not harm the Plaintiffs because "[i]t is without question that reporting the foreclosure would have done far more

damage to Plaintiffs' credit than reporting them as delinquent." (Def.'s Mem. 5). Not only is this statement an issue of fact or expert opinion, but it is untrue.  In fact, PNC goes as far as to say "[i]t was not objectively unreasonable for PNC to report on Plaintiffs' credit history ***more favorably than they deserved***, while the validity of the facts relating to the more damaging reporting were being litigated." (Def.'s Mem. 17) (emphasis added). Notably, PNC concedes that its reporting was inaccurate. (Def.'s Mem. 17) ("Instead, PNC appears to have been giving Plaintiffs the benefit of the doubt by reporting on their credit as if their position in the ongoing litigation was correct.").

More importantly, PNC arguments suffers from a mistaken assumption that there were only two ways to report the trade line: (1) as if the foreclosure properly occurred in April 2011; or (2) as if the foreclosure never occurred and Plaintiffs missed their monthly mortgage payments from April 2011 through January 2012 and that the Plaintiffs had a past due balance in excess of $54,000. These were not the only two choices available to PNC. For example, it could have stopped reporting on the trade line altogether until the pending litigation was resolved or it could have reported "no data" or "unknown" from April 2012 through January 2013. PNC did neither. Instead, it reported a past due amount of $54,431, that Plaintiffs missed their payment (which PNC would not accept or acknowledge) each month from April 2012 through January 2013 in the amount of $2,592, that there balance exceeded $320,000.00, while at the same time reporting that foreclosure proceedings were initiated. (Am. Compl. ¶¶ 88-95). This reporting was incomplete, inaccurate, and entirely misleading given PNC's wrongful foreclosure and its position taken in the litigation. Regardless, there is no excuse for its failure to notate that the account was disputed as required by *Saunders*.

PNC's argument is also ignores settled case law that the FCRA requires more than technical accuracy and that a "consumer report is inaccurate not only when "patently incorrect"

but also when it is misleading." *Saunders*, 526 F.3d at 142; *Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) (information was inaccurate because "any person could easily have" misconstrued the reporting.). The Fourth Circuit and courts across the country agree that even a technical truth (which did not occur in this case) "can be as misleading as an outright truth where it paints a misleading picture." *Saunders*, 526 F.3d at 142; *Dalton*, 257 F.3d at 415 (4th Cir. 2001). In this case, the reporting was not accurate. At best, it was incomplete and misleading.

PNC also makes an absurd argument that "none of the disputes that Plaintiffs allegedly submitted to the Bureau Defendants would have required PNC to conduct a detailed searching of its records…". (Def.'s Mem. 18). Of course, this is incorrect based on the binding precedent in *Johnson*. It is also entirely inappropriate for PNC to assert the reasonableness of its procedures at a Rule 12(b)(6) stage, where the allegations in the Amended Complaint are read in the light most favorable to the Plaintiff and discovery has not commenced. Moreover, this issue -- whether the furnisher has instituted and complied with the requirement to implement and follow reasonable procedures -- has been generally considered to be a jury question. *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 416-17 (4th Cir. 2001) ("The issue of whether the agency failed to follow 'reasonable procedures' will be a 'jury question[ ] in the overwhelming majority of cases."); *Guimond v. Trans Union Credit Info. Co*, 45 F.3d 1329, 1333 (9th Cir. 1995). *See also Andrews v. TRW Inc.,* 225 F.3d 1063, 1068 (9th Cir. 2000) ("'It would normally not be easy for a court as a matter of law to determine whether a given procedure was reasonable in reaching the very high standard set by the statute ....'").

**6. The Complaint Adequately Alleges Actual Damages.**

Assuming, *arguendo*, that the Amended Complaint did not state a plausible claim for a willful violation of the FCRA (which it does), § 1681o authorizes consumers to recover actual

damages sustained from negligent violations of the FCRA. The Amended Complaint alleges that the Plaintiffs suffered actual damages as a result of PNC's violations of the FCRA, including but not limited to "loss of time working to the reporting of the inaccurate account, loss of credit, damage to reputation, embarrassment, humiliation, sleepless nights and other mental and emotional distress." (Am. Compl. ¶109). Each one of these damages is compensable under the FCRA. *Robinson v. Equifax*, 560 F.3d 235, 241 n.2 (4th Cir. 2009)(finding lost income from time missing from work addressing a CRA's error to be compensable damages); *Dalton Capital Assoc. Indus.*, 257 F.3d 409 (4th Cir 2001)(damages for loss of reputation and emotional distress are available under the FCRA); *White v. Imperial Adjustment Corp.*, 2002 WL 1809084 (E.D. La. Aug. 6, 2002) *aff'd on other grounds*, 75 Fed. Appx. 972 (5th Cir. 2003) (noting that damages for humiliation and mental distress are available even without proof of pecuniary damages.). In its memorandum, Defendant argues that Plaintiffs' "unspecified emotional distress and loss of credit opportunities . . . . lack the factual enhancement necessary to survive motion to dismiss." (Def.'s Mem. 5).

A similar argument was rejected by this Court in *Bouredelais*, where the Court found that similar allegations were sufficient to survive the defendant's motion to dismiss. In relevant part, the Court found:

> Second, the damage allegations are sufficient to survive the motion to dismiss. Bourdelais asserts that "[a]s a result of this conduct [in violation of § 2605(e) ] ..., [she] suffered actual damages including without limitation ...: loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress." (Fourth Amended Compl. ¶ 162.) Accordingly, Bourdelais has specified the types of actual damages she seeks and has satisfactorily alleged a causal relationship between the conduct and the harm.

*Bouredelais*, 2012 WL 5404084, at *10; *see also Carter v. Countrywide Home Loans, Inc.*, Civil No. 3:07cv651, 2008 U.S. Dist. LEXIS 67014, at *25-26 (E.D.Va. 2008) (denying defendant's

motion to dismiss on the grounds that plaintiff sufficiently alleged actual damages (including emotional and mental distress, frustration, humiliation, and damage to reputation) arising from defendant's violation of § 2605(e)). Thus, the Amended Complaint more than adequately alleges actual damages and casual relationship between PNC's FCRA violations and the alleged damages.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss in its entirety. The Plaintiff has asserted a detailed and comprehensive Complaint that more than provides specific facts to support its claims for relief. The Plaintiff has pled sufficient facts to state a claim for Breach of the Implied Covenant of Good Faith and Fair Dealing, and for FCRA violations, all of which are consistent with the law of Virginia, the Fourth Circuit, and the specific holdings of this Court.

Respectfully submitted,

**SHIRLEY AND MICHAEL FADDEN**

_____/s/_____
Kristi C. Kelly, Esq. (VSB #72791)
Andrew J. Guzzo, Esq. (VSB #82170)
Kelly & Crandall, PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
Telephone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Leonard Anthony Bennett, Esq. (VSB #37523)
Susan Mary Rotkis, Esq. (VSB #40693)
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
757-930-3660
Fax: 757-930-3662
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of March 2014 I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification to the following:

Constantinos George Panagopoulos
Ballard Spahr LLP (DC)
1909 K Street NW
12th Floor
Washington, DC 20006
(202) 661-2202
Fax: (202) 661-2299
Email: cgp@ballardspahr.com
*Counsel for PNC Mortgage, a*
*Division of PNC Bank, N.A.*

Grant Edward Kronenberg
Morris & Morris PC
11 South 12th Street
5th Floor
PO Box 30
Richmond, VA 23218
804-344-6334
Fax: 804-344-8359
Email: gkronenberg@morrismorris.com
*Counsel for Trans Union, LLC*

Joseph W. Clark
Edward M. Wenger
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001
Email: jwclark@jonesday.com
Email: emwenger@jonesday.com
*Counsel for Defendant, Experian Information*
*Solutions*

John Willard Montgomery, Jr.
Montgomery & Simpson, LLLP
2116 Dabney Rd., Suite A-1
Richmond, VA 23230
Telephone: (804) 355-8744
Email: jmontgomery@jwm-law.com
*Counsel for Equifax Information Services*

_____/s/_____
Kristi C. Kelly, Esq.